75111. CUMRINE v. IPG, INC.
(367 SE2d 581)

CARLEY, Judge.

Appellee-defendant is a closely-held professional corporation engaged in the practice of architecture in Valdosta, Georgia. Until his retirement in 1984, appellant-plaintiff was a principal shareholder in appellee. In 1980, appellee and its shareholders, including appellant, entered into a "buy-sell" agreement. The "buy-sell" agreement provided that either upon the termination of a shareholder's interest by a majority vote of appellee's board of directors or upon the retirement of a shareholder, appellee would buy back that shareholder's stock. The agreement specified employment of a different formula for calculating the valuation of a shareholder's stock, depending upon whether the shareholder's interest was being terminated by action of appellee's board of directors or the shareholder was retiring. A higher valuation of a shareholder's stock would result from application of the retirement formula than would result from application of the termination formula. There was consideration for the placement of a higher valuation upon the stock of a retiring shareholder. The agreement provided that, by the giving of 60 days' notice of his retirement "and the acceptance of the note of [appellee] for his shares, such [retiring] shareholder agrees that for a period of five years following the sale of said shares, he will not engage, directly or indirectly, in the practice of architecture within the State of Georgia or within a radius of 300 miles of the City of Valdosta, whichever is the greater, either as an individual practitioner or as an employee of any firm, company, or corporation, engaged in rendering architectural services. Provided, nevertheless, that, with the written permission of [appellee], such retired shareholder may engage as a self-employed individual in the rendering of any specialty supportive service of architecture so long as such endeavor would not be competitive to [appellee's] general practice of architecture; it being the intent and purpose of the increased consideration paid to such retiree . . . that the good will of the retiree as a former principal of [appellee] and as a retiree from [appellee] shall continue to accrue to [appellee]."

In 1982, appellee experienced a decreased demand for appellant's

services as a writer of architectural specifications. As the result, the parties entered into an oral agreement, whereby appellant was to work only "half-time" for appellee. In a letter which confirmed the terms of this oral agreement, the president of appellee wrote the following to appellant: "We understand and accept that you expect, on your personal time, to write spec[ification]s for other architects on a contract basis. On this work for other offices, you will not allow yourself to be considered a member of the other office's staff, nor allow your name to be listed as a resource or consultant for promotional purposes of other firms. . . . Based on existing conditions and attitudes, we expect the working relationship defined in this letter to remain valid until your retirement at age 65." Thereafter, beginning in early 1983, appellant maintained two separate offices. He kept his office with appellee and, in order to pursue the writing of specifications for other architects on a contract basis, he rented additional office space. This additional office space was rented from another Valdosta architectural firm and was located on the premises of that other firm's own business office. Appellant did not inform appellee that he was renting office space in the office of another Valdosta architectural firm and he continued to operate out of both offices until his retirement from appellee became effective in September of 1984. In a letter which confirmed the acceptance of appellant's retirement, appellee's president stated that appellant's "stock will be repurchased in accordance with our agreement with you. We will request an accountant to make an evaluation after which we will establish a payment schedule with you."

After his retirement, appellant continued to maintain and to work out of his office at the other Valdosta architectural firm. In October of 1984, appellee first learned that appellant was maintaining another office. The president of appellee informed appellant that the maintenance of an office on the business premises of another architectural firm was not acceptable to appellee and he demanded that appellant cease any association with that other architectural firm. When appellant refused these demands, appellee's board of directors purported to terminate appellant's interest in appellee. Thereafter, appellee refused to place the higher value on appellant's shares pursuant to the retirement formula provided in the "buy-sell" agreement and gave appellant's stock the lower valuation in accordance with the formula provided in the termination provision of the agreement.

Appellant filed this suit, alleging that appellee had violated the "buy-sell" agreement through its refusal to buy his shares at the higher valuation under the retirement provision thereof. Appellant also sought the appointment by the trial court of an independent auditor for the valuation of his stock. Appellee answered, denying the material allegations of appellant's complaint. Cross-motions for sum-

mary judgment were filed. The trial court granted summary judgment in favor of appellee and denied appellant's motion. The result was a money judgment in appellant's favor for an amount which represented the lesser value of his stock as calculated under the termination formula of the "buy-sell" agreement. Appellant appeals from the trial court's order on the cross-motions for summary judgment.

1. Appellant enumerates the trial court's rulings on the cross-motions for summary judgment as error, contending that those rulings evince an erroneous construction of the applicable provision of the "buy-sell" agreement for the determination of the value of his shares. Appellant urges that the trial court erred in construing the termination provision rather than the retirement provision of the contract as the applicable provision pursuant to which the valuation of his shares was to be made. Appellee, on the other hand, contends that, the trial court correctly interpreted the contract and, based upon that construction, properly granted summary judgment in its favor and denied appellant's motion for summary judgment. According to appellee, appellant's continuing maintenance of his independent office and his continuing engagement in the writing of architectural specifications without appellee's written consent showed that appellant was not in compliance with the non-competitive covenant of the retirement provision of the "buy-sell" agreement. Thus, according to appellee, appellant was not entitled to have his shares valued pursuant to the retirement formula but was entitled only to the lesser value based upon the authorized termination of his interest in appellee.

Under the terms of the retirement provision of the "buy-sell" agreement, it was only "[b]y the giving of [60-days'] notice *and* the acceptance of the note of [appellee] for his shares, [that] such [retiring] shareholder agree[d] that for a period of 5 years following the sale of said shares, he [would] not engage, directly or indirectly, in the practice of architecture within the State of Georgia or within a radius of 300 miles of the City of Valdosta, whichever is the greater. . . ." (Emphasis supplied.) Pursuant to these terms, appellee would have no right whatsoever to insist that appellant, as a retiree, cease to engage in any act of competition until such time as appellee itself had offered appellant the higher valuation for his shares and appellant had accepted that offer. Nothing in the agreement contemplates that appellant's non-competition, as a retiree, is to be a *condition precedent* to appellee's own obligation to calculate and to offer appellant the greater valuation for his shares, which valuation the agreement unconditionally provides is to be afforded to a retiree for his shares. Instead, the agreement clearly provides that appellant's post-retirement non-competition is only to be considered as the contemplated *consideration* which supports appellee's unconditional offer to purchase appellant's shares at the greater valuation. Appellee cannot

insist that it is entitled to receive that consideration until such time as appellant is contractually obligated to provide it, which will be when appellee's offer to appellant, as a retiree, of the higher valuation has been accepted and appellee has purchased appellant's shares at that greater valuation.

If, after appellee has made its required offer of the higher valuation to appellant as a retiree, appellant then refuses to sell appellee his shares, appellee might be authorized to obtain appellant's shares pursuant to the termination provision of the contract. However, appellant's retirement having already been tendered *and accepted* by appellee, appellee would have no right under the agreement to obtain appellant's shares by its unilateral termination, but would be required to offer appellant the greater valuation for his shares as contemplated under the retirement provision of the contract. The retirement provision of the "buy-sell" agreement unequivocally provides that the "sale and settlement of the shares held by such retiring member *shall* proceed" based upon the higher valuation of appellant's shares. (Emphasis supplied.) "The word 'shall' is . . . a word of command. . . ." *Favors v. Travelers Ins. Co.*, 150 Ga. App. 741, 746 (1) (258 SE2d 554) (1979). As a retiree, appellant "shall" be afforded the higher valuation for his shares and agrees to curtail his competition only *after* he has been offered and has accepted the higher valuation for his shares.

It follows that the trial court erroneously construed appellant's non-competition as a condition precedent to appellee's contractual obligation to offer appellant an amount reflecting the greater valuation for his shares. Appellant's non-competition is correctly construed as the consideration which supports appellee's offer to appellant, as a retiree, of the greater valuation for his shares. Should appellant accept appellee's offer of the greater valuation but thereafter engage in activities which appellee considers to be in violation of the non-competition covenant, only then would appellee be authorized to seek the enforcement of the covenant that was the consideration for the higher valuation placed on appellant's shares. Under the present posture, however, it is appellee rather than appellant who is in violation of the "buy-sell" agreement. Appellee is in breach of its contractual obligation to offer appellant the greater valuation for his shares and it cannot defend that breach by reliance upon appellant's acts of alleged competition. It follows that the trial court erred in granting summary judgment in favor of appellee and in denying appellant's motion as to the rights and obligations as they currently exist under the "buy-sell" agreement.

2. Several enumerations of error relate to the extent to which the non-competition covenant is enforceable by appellee and against appellant. However, these enumerations raise issues which cannot be addressed and answered in the present case. Appellee did not seek to

enforce the non-competition covenant against appellant. Instead, appellee erroneously sought only to rely upon appellant's alleged violation of the non-competition covenant as a defense to appellant's efforts to enforce its contractual obligation to offer him the higher valuation for his shares. The trial court accepted appellee's construction of the non-competition covenant as a condition precedent to appellant's entitlement as a retiree to the higher valuation. However, as we have held in Division 1, appellee cannot rely upon the non-competition covenant and appellant's alleged breach thereof as a basis for avoiding its *monetary* obligation to appellant as a retired shareholder. Should appellant accept the higher valuation for his shares mandated by this opinion and thereafter continue to engage in his current activities, appellee will then be entitled to seek, if it wishes, the *equitable* enforcement of the covenant. The extent to which appellee may be entitled to the future enforcement of the covenant as consideration for appellant's acceptance of the higher valuation of his shares must obviously await determination in a proceeding in which that issue is properly raised and ruled upon. All that we can hold in this opinion is that, regardless of whether appellant's current activities would, if repeated at some point in the future, violate the non-competition covenant and thereby entitle appellee to equitable relief, those activities do not presently entitle appellee to avoid its existing contractual obligation to offer appellant, as a retiree, the higher valuation for his shares.

3. Appellant further enumerates as error the trial court's refusal to appoint an independent auditor for the calculation of the value of his stock. However, the "buy-sell" agreement specifically provided that "[i]n the event of any disagreement as to calculation, the Certified Public Accountant [CPA] regularly engaged by [appellee] shall make the determination of such amounts and the CPA's findings shall be binding on all parties." "Where the parties to a contract agree that the decision of a third person on a matter connected with the execution of a contract shall be final and conclusive, his decision is binding on the parties, as to those matters he is authorized to determine, except in the case of fraud, gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment. [Cit.]" *Skinner v. Smith*, 120 Ga. App. 35, 36 (169 SE2d 365) (1969). The record reflects that appellee's CPA has made the determination of the higher and the lower valuation of appellant's shares. Appellant neither alleged nor proved that, in so doing, appellee's CPA had committed fraud or gross mistake or had failed to exercise an honest judgment. Accordingly, the trial court did not err either in holding that the calculations of appellee's CPA were binding upon appellant or in failing to appoint an independent auditor to make the valuation of appellant's shares.

4. With regard to the construction of the "buy-sell" agreement and the rights and obligations thereunder, the trial court erred in granting summary judgment in favor of appellee and in failing to grant summary judgment in favor of appellant. With regard to the binding effect of the calculations of appellee's CPA and appointment of an independent auditor, the trial court correctly denied appellant's motion for summary judgment and granted summary judgment in favor of appellee.

*Judgment affirmed in part and reversed in part. Banke, P. J., and Benham, J., concur.*

DECIDED MARCH 16, 1988.

*John T. McTier*, for appellant.
*J. Converse Bright*, for appellee.